Kelsey *v.* Northern Light Oil Company.

SUTHERLAND, J., concurred in the conclusion.

Order reversed.

[NEW YORK GENERAL TERM, January 4, 1869. *Clerke, Sutherland* and *Geo. G. Barnard*, Justices.]

———— • ◆ • ————

COURTLANDT KELSEY *vs.* THE NORTHERN LIGHT OIL COMPANY.

In an action against a corporation, by a stockholder, to have his contract of subscription rescinded and the amount he had paid refunded to him, on the ground that the company did not acquire or own certain pieces of property which it was represented it would acquire, the judge charged the jury that if, upon the prospectus, "the plaintiff had the right to believe that it was reasonably certain that the company would acquire such property, and that the company was organized with a view to ownership of those pieces of property, then, if they did not obtain it, he would be entitled to recover." *Held* that the charge was erroneous.

A corporation being about to be formed, for the purpose of dealing in and developing oil, in oil lands, certain named property was expected to consti-

tute its invested capital. After it should become organized it was to purchase the several pieces of oil property mentioned in the prospectus. It succeeded in obtaining all, except one piece, as to which there was some defect of title. *Held*, that in the absence of any misrepresentation or fraud, a stockholder could not, on the ground of the failure of the company to acquire all the land mentioned in the prospectus, maintain an action against it to recover back the amount paid by him upon his subscription. MULLIN, J., dissented.

Such an action cannot be sustained unless the objects and purposes of the company have so entirely failed that the corporation may be said to be virtually dissolved. *Per* PECKHAM, J.

Where there is, at most, a failure only as to about three fourths of one tenth of the property intended to be owned by the company, and the money to buy that is in the company's treasury, this is not a sufficient ground for dissolving the corporation. *Per* PECKHAM, J.

THE plaintiff alleges in substance, in his complaint, that he became a subscriber to the capital stock of the Northern Light Oil Company of New York, upon the strength of certain representations alleged to have been made by the company that they owned certain property, and also upon the strength of a further representation, alleged to have been made by the company, that all subscribers, not finding the property as represented, could withdraw from the company. He then alleges that the company did not own certain pieces of property which were thus represented to be owned by them; that the stock of the company had become much depreciated in value, and that he had tendered back his stock and demanded the amount of his subscription to be repaid to him by the company, which they had refused to do.

The defendants, in their answer, denied the making of any of the alleged representations, and in the main denied all the material allegations of the complaint; admitting, however, that they never did own two certain pieces of property which the complaint had alleged the company had represented it owned, and stating, by way of explanation, that they failed to acquire this property in consequence of a defect in the title.

Kelsey v. Northern Light Oil Company.

On the trial, the plaintiff proved that one Lockwood solicited him to subscribe for or take 100 shares of the stock, and at the time exhibited to him what purported to be a *prospectus*, and also an advertisement respecting the company, cut from the columns of some newspaper, and that he thereupon signed a paper agreeing to take 100 shares of the stock. It appeared that Lockwood acted as an agent or broker under the direction of one Avis, of the firm of Avis, Plumer & Co., of New York. The plaintiff attempted to prove that Avis was authorized by the company to exhibit the prospectus and procure subscriptions, but the evidence upon this point went no further than to tend to show that certain of the trustees had given such authority to Avis. No evidence whatever was offered that the company, by any corporate action, ever authorized any one to exhibit any prospectus, make any representation, or procure any subscriptions to the stock. The plaintiff's evidence, however, was received against the defendants' objection, as evidence of authority conferred upon Avis by the company.

The plaintiff also proved that Sylvanus J. Macy, one of the trustees and the treasurer of the company, received the money paid by the plaintiff for his stock, and sent him the certificate; and it was claimed that Macy so received the money on behalf of the company, and that the company thus took to itself the benefit of the contract or subscription made by the plaintiff, and thereby became bound by the representations upon which it was made, as much as if they had originally authorized them to be made.

The defendants introduced contradictory evidence as to any representations having been at any time directly authorized by the company. They further proved that, prior to the time of the formation of the company, all of its capital stock was, by an agreement among the projectors, disposed of, and that, immediately upon the

formation of the company, a resolution was passed, recognizing this prior agreement, and directing that all the capital stock, with the exception of a thousand shares, should be issued to Mr. Macy, as a special trustee for those who had thus agreed to take the stock, and that the thousand shares excepted as above mentioned, were at the same time taken by the gentlemen becoming the trustees, and paid for, and the certificates issued to them, so that, at the time of the plaintiff's subscription, the company did not own or have the control of a single share of its stock.

The defendants further offered evidence, showing that Mr. Avis was one of the projectors, and by the agreement before mentioned was to take 5000 shares of the stock, and that the stock which the plaintiff received was not issued to him by the company, but was transferred to him by Mr. Macy as a portion of the 5000 shares which he had agreed to take, and that that was all done by Mr. Macy, without any direction from the company, who had nothing to do with the stock but by the authority and direction of Mr. Avis.

It appeared, upon examination of the prospectus, that it did not purport to be issued by the company, or by its authority, but by the projectors of the company, of whom the only ones named in it were George A. Boyce, and Avis, Plumer & Co.

The principal points of contest at the trial were, as to whether the alleged representations were of an existing state of facts, or of what was in contemplation merely, and as to whether the defendants or Avis, Plumer & Co. were the real principals of Lockwood, who procured from the plaintiff his subscription. The learned judge left the first question to the jury. As to the second, he held, upon the evidence, that the company were the *real principals,* and so instructed the jury, in effect.

Exceptions were taken to some of the rulings of the

Kelsey *v.* Northern Light Oil Company.

learned judge upon the admission and exclusion of evidence, the denial of the defendants' motion to dismiss the complaint, and to portions of his charge to the jury.

The case came before the general term, upon the defendants' appeal both from the judgment and the order of the special term denying a motion for a new trial.

PECKHAM, J. In my opinion the judgment should be reversed. Apart from any other question, there was one proposition submitted to the jury, by the learned judge, which I think cannot be maintained, and upon which the verdict may well have been based. He charged that "If upon this paper (the prospectus) the plaintiff had the right to believe that it was reasonably certain that the company would acquire this property, and that the company was organized with a view to ownership of these pieces of property, then, if they did not obtain it, he would be entitled to recover." Upon this charge the jury must necessarily have found for the plaintiff.

It will be marked, here, that no misrepresentation or fraud is the basis of this verdict; none is within this charge. Here was a corporation about to be formed, with a capital of one million. Certain named property was expected to constitute its invested capital. Its business was to deal in and develop oil in oil lands. After its organization, it was to purchase the several pieces of oil property mentioned in the prospectus. It succeeds in obtaining all, except one piece, called the "Hammond well," or the piece upon which said well was sunk. As to this piece there was some defect of title, and the consideration money therefor, $75,000, was paid to or left in the treasury of the company.

The good faith of the company, or of its agent, is not questioned.

Thus, if this action can be maintained, every other subscriber to the stock, or every stockholder, may sue the

company. This plaintiff has no other or greater rights than any other stockholder. It follows that if a company fail to obtain all the property it expected and intended, or its stockholders expected and intended to obtain, when the stock was subscribed for, no matter for what cause, the whole scheme is dead, and the company ended.

There is no such doctrine as this, and there never was. The cases cited by counsel have no application to subscribers to a company about to be organized and incorporated. No such case can be found, I think. The cases cited, *Hutcheon* v. *Johnson,* (33 *Barb.* 392;) *Bennett* v. *Judson,* (21 *N. Y. Rep.* 238;) *Rosevelt* v. *Fulton,* (2 *Cowen,* 129;) *Smith* v. *Countryman,* (30 *N. Y. Rep.* 655;) and 27 *Id.* 558, I have examined, and they do not aid the plaintiff.

The plaintiff can scarcely be said to have been disappointed as to this "Hammond well." He had never seen or examined any of this property prior to his subscription. When examined thereafter, the Hammond well had ceased to flow. There is no pretense that it had not flowed before, and it was a characteristic of these wells that they would stop when they chose. Its stopping should have surprised no one. But having stopped and become comparatively worthless, as the plaintiff seems to insist, there would seem to be very small excuse for him to repudiate his subscription on the ground that the company was about $75,000 better off, in that respect, than it would have been had it obtained this now worthless Hammond well.

It is very difficult to discover the principle upon which this action can be claimed to lie. It seems to me it cannot be sustained, unless the objects and purposes of the company have so entirely failed that the company may be said to be virtually dissolved. That cannot be pretended, here. At most there is a failure only as to about three fourths of one tenth of the property intended to be owned by the company, and the money to buy that was in the company's treasury. Only the title was defective, and it could not

be purchased. I do not deem this any ground for dissolving the company. Very few companies in this country could be upheld if any such ground would dissolve them.

But even if this should be held to be proper ground for dissolving the company, it by no means follows that one of the subscribers to its stock could maintain an action against it for the money subscription. Assuming the property now to be of comparatively small value, upon what principle of equity should this plaintiff sue and get his money back, while his co-subscribers should be compelled to take the reduced property for their shares?

The judgment should be reversed, and a new trial granted; costs to abide the event.

J. F. Barnard, J., concurred.

Mullin, J., (dissenting.) To entitle the plaintiff to recover in this action, it was incumbent upon him to prove that he had subscribed for 100 shares of the capital stock of the defendant and had paid for the same. If he purchased of some other party, or had not paid, this action must necessarily fail.

He proved, on the trial, a certificate concededly issued by the defendant's officers, for 100 shares of stock, and he introduced the receipts of an officer for the amount to be paid therefor. Upon this evidence there could be no doubt but that the plaintiff was a subscriber for the stock of the company by means of a contract made with the company, or its authorized agents.

After the evidence was given, it devolved upon the defendant to prove that the contract for the stock was with Avis, Plumer & Co. or some other person, and not with the company. And it was required to satisfy the jury that the agreement was not with the defendant, for the stock; in other words, it must overcome the case made by the

plaintiff's evidence, or the jury were bound to find the fact to be as proved on the part of the plaintiff. The defendant gave its evidence, and the jury found against it; and for the purposes of this appeal it must be taken to be the fact that the defendant was the vendor of the stock, pursuant to a contract made with the plaintiff.

But if I am wrong in this, a brief examination of the evidence on the part of the defendant will show that so far from overcoming, it strengthens the case made by the plaintiff.

One of the grounds relied on to prove that the contract for the stock could not be with the company, is that certificates for the entire capital stock had been issued to subscribers before the plaintiff subscribed, and there was not, therefore, any stock owned by the company, which it could sell or deliver to the plaintiff.

It was proved, on the trial, that on the same day the company was organized, (which seems to have been the 24th October, 1864,) nine of the trustees subscribed for $10,000 of the stock, and a resolution was passed that the remaining $990,000 of the capital, together with $10,000 in cash, be delivered to one Macy, the trustee for the purchase of the oil lands proposed to be acquired by the company, "*when he shall deliver to this company the title and possession of said property.*" In pursuance of this resolution, the officers did issue to Macy a certificate for 99,000 chares, and certificates for 100 shares to the other subscribers. The date of the certificate to Macy is the 4th of November.

The plaintiff's subscription for the 100 shares and the payment of $300 upon it were, as Lockwood testifies, concurrent acts. That money was received by Macy on the 11th of November, and for it he gave a receipt as trustee. The date of the plaintiff's subscription must have been after the 3d of November, because Lockwood testifies that Avis gave him, when he came to Bridgeport to see him,

papers dated the 3d of November. I think we may assume that the plaintiff's subscription was between the 3d and 11th of November.

If the subscription was on or after the 4th of November, Macy held, when it was made, the whole capital stock of the company, except the 1000 shares issued to others, as above stated. If, however, he had not received a conveyance of the property, the stock was still the property of the company; it had no validity until it was delivered in payment of the land. When he received or delivered to the defendant a conveyance of the oil lands, there is no proof in the case. When he did receive such conveyance, the stock became the property of the owners of the land, as Steele testifies that the owners of the land were to have voted to them the whole stock of the company to pay for the property.

It is not proved that, when the plaintiff subscribed, the company did not own the 99,000 shares of its stock. But let us suppose it had transferred to Macy all of said stock. We look in vain for any evidence that there was any notice given to the plaintiff that he was purchasing stock of Avis, Plumer & Co., or other stockholders of the company. The arrangements between the owners of the land and the trustees of the company—the resolutions of the 25th of October—were known to the trustees only, and were not known to the plaintiff. If he was purchasing stock of a stockholder, it was a fact unknown to him. He was asked to *subscribe* for stock, and he did. The only subscription for stock that can be made is for the stock of the company, and when made, it is a contract between the company and the subscriber. No person holding stock in a corporation and desiring to sell it, would ask another to subscribe for it. That language is, I repeat, only used when it is proposed to another to enter into a contract with an existing corporation for a portion of its capital stock.

It is said that this agreement, signed by the plaintiff,

was not in form an agreement with the company, but is an agreement between the several subscribers to take stock, upon terms indicated in the paper itself. I do not find that the paper actually signed by the plaintiff is inserted in the case, and I assume that the counsel understands that the plaintiff signed the same paper to which is affixed the names of Aspinwall and others, whereby they agree to take, in the aggregate, $582,500 of the stock. That paper recites that certain persons named proposed to organize a company with a capital of $1,000,000 to purchase certain coal lands, and to issue in payment therefor 100,000 shares of the capital stock of said company. They agree to subscribe the sums set opposite their names, towards purchasing the annexed schedule of property, to be paid to trustees to be elected by the subscribers *after the whole amount of stock shall have been taken,* as follows: 30 per cent when the whole amount of stock is taken; 20 per cent thirty days thereafter; 20 per cent in sixty and 30 per cent in ninety days. By this paper the stock of the company, when organized, was to be issued to pay for the land, and what obligation was assumed by those subscribing it, it is difficult to comprehend, unless it is to be deemed an agreement to take stock in the company when organized. If this is the meaning of it, then it ceased to be an agreement to take stock in such a company when it was actually incorporated; and it is certain that the plaintiff did not sign until after incorporation.

Had the stock not been actually issued to the plaintiff, no action could have been maintained against him, on this paper, if it is the one signed by him. But when he paid and received a certificate for his stock the agreement was complete, and it ceased to be of the slightest importance whether it was a valid or void agreement he had signed.

If this paper showed that the defendant was contracting for stock which had been issued to and held by other par-

ties, it would of course preclude him from saying that he purchased of the company. But such is not the fair import of the paper.

It may be said that the intention as disclosed by this paper was to issue the stock of the company in payment of the land, and that the persons signing this agreement thereby obligated themselves to take from the persons to whom the stock was issued, stock to the amount subscribed by each. To justify this construction, it must appear that the stock was actually and in good faith transferred by the company to the persons selling the land. The paper manifests no such intention. The owners of the land never intended to take stock in payment of their property. The very terms of the agreement are, that each subscriber becomes such for the amount or number of shares set opposite his name "*towards purchasing the annexed schedule of property at* $1,000,000." Each subscriber annexed to his signature an amount in dollars and cents, and not shares.

The manner in which the arrangement was carried out shows that it was never the intention that the owners of the land should take their pay in stock. The transfer was to *Macy* as *trustee*, and before title to the property was conveyed, he proceeded to sell the stock and give certificates, in the name of the company, to whoever was entitled.

No person reading this paper after the organization of the company, would suppose that he was buying stock of Macy, as trustee or otherwise; and the whole business was conducted so as to convey to subscribers the impression that they were dealing with the company. Yet it is now claimed that the company had no stock to sell, and they were dealing with men of whose existence they had no knowledge, and with whom they never intended to contract.

When the plaintiffs and others who subscribed after the incorporation of the company paid money on the stock, they received a receipt signed by *Macy, trustee*. Trustee

of what? He was a trustee of the company, and publicly known as such. He was the *special* trustee appointed by a resolution of the board to receive the stock and pay it out for the land. The plaintiff knew him in the *former* character, but not in the *latter.* The designation of trustee, used in signing the receipt, was conclusive evidence to the plaintiff that his money was received by the company. And if this designation can now be used to charge the plaintiff with the knowledge that Macy was a special trustee, it would be imputing to him knowledge which, upon the proof in this case, he never had.

It is next insisted that the company never authorized Avis to issue the prospectus, and as a consequence, that it is not liable for any representations contained in it. This was a question for the jury, and they have disposed of it. But let us see whether the finding that it was authorized by the company is not supported by the evidence. Avis says he was requested by Howland, Kent, Watson and others, to assist in getting up a company; that he prepared the prospectus and submitted it to Howland, Kent, Brown, Jones and Steele, at a meeting at which all these persons were present. They approved it, and he had it published by their directions. These persons took copies to get subscribers; and he knew that Howland used them in getting subscribers. The company paid for printing it. And Lockwood testifies that he showed the prospectus, on one occasion, to Howland, the president, and asked him if its statements were correct, and he said they were. The witness could not say that he saw its contents. Avis testifies that he was employed by the company to procure subscriptions for stock, and he delivered this prospectus to Lockwood, and Lockwood exhibited it to the plaintiff as a document issued by the company, and upon the strength of it the plaintiff's subscription was obtained.

Of the persons advising the preparation and presenting

of the prospectus to be used in procuring subscriptions to stock, who knew its contents and approved of them, Howland, Steele, Macy and Watson, were elected trustees, and they knew, therefore, the contents, and the use intended to be made of the document.

Many of these matters are denied by Howland and Macy, but the jury have believed the plaintiff's witnesses, and unless the court is, for the purposes of this case, to usurp the province of the jury, the finding on this point must stand.

In answer to all this, it is said there is no proof that the corporation ever authorized any person to receive subscriptions for stock. That Avis, Plumer & Co. were not only agents for the corporation, but were authorized to receive subscriptions for stock, is established by the letters of the secretary, of October 28th, 1864, addressed to A., P. & Co., in which he asks them to bring to the office of the company all the subscription lists that they might have to the stock of the company, and to withdraw all advertisements. Can there be a more unequivocal recognition of an agency than this? The trustees of the company knew of the issuing and use to be made of the prospectus. One of them used it to induce subscriptions of stock. Avis, Plumer & Co. were the agents of the company to procure subscriptions, and they employed Lockwood for that purpose, delivering him the prospectus. He used it to induce persons to subscribe. The money paid on such subscriptions, and the subscriptions themselves, were sent to the company, credit given for it, and stock issued.

In view of these facts, it is impossible to say that the company was not the seller of the stock.

The defendant's counsel doubts the truthfulness of the testimony of Avis, and suggests that it is unworthy of credit. But with the amount of credit to be given to his evidence, we have nothing to do. It was for the jury to

pass upon that question, and with their decision we must be content.

If it be true that the corporation was the vendor of the stock, it follows that it is chargeable with whatever legal responsibility results from the contract; and it is responsible for the representations of its agents, by which the plaintiff was induced to enter into the contract, whether honest or fraudulent.

The representations on which the plaintiff claimed he relied, and which induced him to enter into the contract for the stock, were those relating to the Hammond well and the Smith Jones farm. And in relation to these, the jury were instructed that if they found that that well and farm were of any such value, and formed so essential a part of the whole scheme that the plaintiff would not have entered into it and become a stockholder if he had understood that the corporation could not have acquired this property, then the representation would be material. There is no exception to this part of the charge, and the jury must therefore have found that the representation was not only material, but so material as that the plaintiff would not have subscribed for stock had it not been for this representation.

Again; it was submitted to the jury to say whether the representation thus made was true; and they were told that it was conceded that the corporation did not acquire title to the pieces of land referred to. To this part of the charge there is no exception, and the jury must have found the representation to be untrue.

This brings me to the point principally relied on by the appellant's counsel to reverse this judgment; that is, the alleged error in that part of the charge to the jury, in which they were told that if the representation was that the defendant was the owner of the property, or it was understood, and it gave the plaintiff reason to understand, that this identical property was to be the property of the

company, and to form the capital with which it was to carry on business, although it might not have owned it at the moment, and he was thereby led into the arrangement, the defendant must make it good.

Again; the jury were told that if upon this paper the plaintiff had the right to believe it was *reasonably certain* that the defendant would acquire this property, and it was acquired with a view to the ownership of the property, if it did not obtain it he would be entitled to recover. But if it·was understood by the plaintiff that the defendant might or might not acquire title to these pieces of property, depending upon contingencies thereafter to occur, then it was not material, and the plaintiff could not recover.

One of the errors in this part of the charge, insisted on by the defendant's counsel, is, that it was submitted to the jury to say which of two constructions of the representations in the prospectus was the correct one—that is to say, whether the representation was that the company had acquired the title to the property, or whether it was reasonably certain that it would acquire it. The counsel insists that the construction was for the court, and not for the jury.

If the prospectus spoke as of a day anterior to the incorporation of the defendant, what was said in it as to a company *to be incorporated,* and *to acquire* property, would naturally refer to an incorporation and acquisition of property *thereafter* to take place. But in that prospectus is found such language as this, speaking of the Rynd Farm Oil Company, " *it is paying a royalty to this company* of one-eighth of all the oil in all the wells, free of expense to *this company.*" Again it says, "the company's property now comprises certain lands and wells which are specified, producing to *this company over* 125 *barrels per day,* which, at $8 per barrel, pays over 36 per cent per annum on its entire capital," &c.

The plaintiff subscribed after the organization. When this prospectus was exhibited to him, what construction was he authorized to put upon this language? The incorporation of the company was not then a thing in the future; that was complete. When it said *this company's* property consists of such and such lands, and *it is in the receipt of so many barrels of oil* per day, was he thereby to understand that the acquisition of property was *yet to be made*, or was he not right in inferring that the company *then owned* all the property it proposed to acquire.

To a proper construction of this paper, it was necessary to ascertain the time it was exhibited to the plaintiff as if before subscribing, it must receive one construction; if after, another.

The general rule is that the construction of contracts belong to the court, and not to the jury. (2 *Cowen & Hill's Notes*, 1420. 17 *Wend.* 538. 23 *Barb.* 431.) But this is not universally true. When there is a conflict of evidence in regard to the terms of the contract, or when there are extraneous circumstances proved which affect the construction, then the construction must be given to the jury. (2 *Cowen & Hill's Notes*, 1420.)

In this case the jury must ascertain the time when it was signed by the plaintiff, and, as a consequence, whether the representation was of something to be done, or as to something which had already occurred. For these purposes, the paper would not be for the construction of the court, but of the jury.

The same considerations which Chief Justice Marshall held in *Elting* v. *Bank of the United States*, (11 *Wheat.* 59,) rendered proper the submission of the construction of certain papers to the jury, in that case, apply in all their force in this. If the representations are to be considered as representations of existing facts, what was said by the court as to "reasonable certainty" of the defendant's procuring the property, would be wholly immaterial. It would

Kelsey *v.* Northern Light Oil Company.

be an instruction upon a proposition outside of the law. But it is due to the defendant that the question whether that branch of the instruction is correct, should be met and decided without regard to any mere technicality, so that if it is wrong, and has caused injury to the defendant, a new trial may be had.

The first objection to this clause of the charge is that it authorized the jury to find for the plaintiff, if they should find the representation to be that the defendant would *thereafter acquire the Hammond well and the Smith Jones farm;* that the acquisition being thereafter to happen, it was contingent and uncertain—matter of conjecture and not of fact.

Aside from any authority upon the precise question thus presented, I insist that the construction is right, upon well settled principles. A company is organized to purchase and work mineral lands, and the officers and agents give out that it will acquire title to certain lands, describing them, which contain valuable ores, and which when worked will yield large dividends to the company. Upon this assurance persons take stock, and it becomes impossible to get title. In the case supposed there is not a shadow of intentional fraud or deception; yet can it be possible that the persons paying cannot sue for and recover their money? In such a case the stockholder would be entitled to recover, either on the ground of mistake or of failure of consideration. But I think also he has the right to rescind the contract, on discovering that the representation as to the mine was unfounded.

The distinction between a representation, which amounts to a positive *assurance* that something *will* occur or *be done*, in the future, whereby the value of the subject matter of a contract will be made more valuable, and one which is the expression of a mere opinion or conjecture, is obvious enough, and is acted upon by men of business every day. And when the assurance is not made good, the other party

to the contract is defrauded. Such a representation, to be relied upon, must of course be of something to be done or acquired, which the person making it has the physical or legal capacity to perform. Such a representation is calculated and intended to have the same influence upon the mind of the other party to the contract that a representation that the act was already done, or thing acquired, would have; and the injury, if it is not done, is precisely the same.

A representation, on the other hand, as to acts which it is not physically or legally possible for the person to perform, or in regard to matters of opinion or conjecture, or such as every vendor of property is permitted to make without incurring liability in the event of their being untrue, the other party to the contract does not rely upon and is not prejudiced if they prove to have been unfounded. Assurances by vendors that they will, before delivering the property sold, cause it to be put in the condition required by the purchaser, is within the class of representations to which I refer. If in such case the purchaser, relying on the assurance that the vendor will do as he assured him he would, pays his money, and the assurance is not made good, the purchaser is relieved from his contract, as effectually as if the assurance related to the present condition of the property, and proved to be untrue. The thing to be done, may be done; the person making the representation is presumed to have informed himself whether he could perform it. In such cases the person to whom it is made is not trusting to opinion or conjecture, but to one of the ordinary contingencies of business. All contracts to be performed in the future involve these contingencies; but no one doubts their obligation, on that account. *Gerhard* v. *Bates*, (75 *Eng. Com. Law*, 475;) *Biddle* v. *Levy*, (2 *id.* 20;) *Seaman* v. *Low*, (4 *Bosw.* 337,) are cases in which the representation was as to something to happen, or to be done, yet it was held to be actionable.

It is conceded by the defendant's counsel that there are cases in which a representation as to something in the future may, if fraudulent, be the basis of an action. But to establish fraud in such case, it must be proved that the person who made the representation knew when he made it that there was no ground for believing that the event to occur, or thing to be done, would be done or occur.

When a man represents to the public that he owns land on a stream which can be made a valuable mill site by purchasing the right to flow his neighbor's land above him, on the same stream, which he avers he is about to do, and offers the land, with the right to flow the neighbor's land, and he sells for a gross sum both the land and the right, is not the purchaser induced to make the contract on the strength of a representation as to a thing thereafter to be done by him? In such a case there is no actual fraudulent intent in the seller. But is not the purchaser injured, just as much as if the sale was procured with the most corrupt intent? Why the question of intent or knowledge should ever have been permitted to enter into such cases, unless to enhance the damages, I cannot comprehend. The question, and the only question, should be, was the representation such as that a prudent man should rely upon it, or was it mere matter of opinion or conjecture in regard to matters as to which no man is justified in dealing upon the opinion of others. If the latter, there is no liability; as to the former, there is.

In the case supposed, would the damage to the purchaser be any greater because the vendor knew, when he made the representation as to his ability to acquire the right to flow his neighbor's land, that such right could not be obtained. The moral wrong may be greater; the legal wrong is not increased a jot.

A principal question here is whether an individual, or corporation, is liable for the fraud of his or its agent. If, as is contended for by the counsel for the defendant, it is

necessary to show knowledge on the part of the agent, of the falsity of a representation made by him, or an intent to defraud the person with whom he is dealing, in addition to the fact that the representation was not true, in order to recover, the question then is, not so much the truth or falsity of the representation—not the motive and intent of the real party to the contract, but of the state of mind of the agent. For the *intent* of the agent, the principal cannot be liable; for the truth or falsity of the representation, he is liable.

When the representation relates to something to be done in the future, and the representation has induced the other party to enter into the contract, to require proof that the agent knew, when he made it, that there was no ground for believing that the act could or would be done, is to make the mental operations or condition of the agent the test of liability, instead of the truth of the representation. Such a rule is unsupported by any principle which should be permitted to regulate the affairs of men.

I am aware that in England and in this country the courts of law have required proof, in order to authorize a recovery, that the person making the representation knew it to be false, or intended to cheat the person with whom he was dealing. It was occasionally held that knowledge or intent need not be proved; that falsity of the representation was enough. The courts of equity, on the other hand, uniformly gave relief when the representation was shown to be false, provided it was material and induced the other party to enter into the contract, or do some other act to his prejudice. In other words, the courts of law required moral fraud to be established. Courts of equity only required legal fraud.

In *Bennett* v. *Judson*, (21 *N. Y. Rep.* 238,) the Court of Appeals applied the rule in equity to actions at law, and has thus swept away the great mass of cases in which knowledge of the falsity of the representation or fraud-

ulent intent on the part of the person making it must be proved, in order to entitle the injured party to recover.

The case of *Bennett* v. *Judson* has no application to a class of cases of frequent occurrence, such as representations of matters of which the person making them cannot be presumed to have any personal knowledge, and as to which he is understood to speak from information derived from others. In such cases, the person making the representation is only liable to relate truthfully what he has heard, or to give his opinion honestly if he speaks of matter of opinion merely. To this class of cases belong representations as to solvency, character, and other matters of the same or similar description. In these cases, in order to recover, it must be proved either that the defendant knew the representation was false, when he made it, or that, not knowing whether it was true or false, he made it with intent to defraud.

In *Bennett* v. *Judson*, a representation is held to be fraudulent when it is proved to be untrue, and the person making it did not know, when he made it, whether it was true or false.

It follows from these considerations that if the representation was of an existing fact, it was not necessary for the plaintiff to prove any thing beyond the untruth of the representation; knowledge on the part of the agent as to its truth being wholly immaterial. This was the very point decided in *Bennett* v. *Judson*. If the representation is to be considered an assertion that the Hammond well &c. would be acquired, and it having been found that this representation was so far material that the plaintiff would not have entered into the contract had it not been made, then it was such a representation as, being found to be untrue, entitled the plaintiff to rescind the contract and to receive back the money paid.

It would be the highest injustice to hold a person bound by a contract when he fails to acquire by virtue of it the

very thing which he entered into the contract to obtain. It is not in such a case that the injured party is turned over to an action to recover, because of a partial failure of consideration.

In *Flight* v. *Booth*, (1 *Bing. N. C.* 370,) a lease was sold at auction, of which a description was given before and at the sale. The plaintiff purchased, but on finding that it did not answer the description, he refused to complete the purchase, and sued to recover the money paid at the time of the sale; and it was held that he was entitled to rescind the contract and recover what he had paid. Here it may be said the contract was executory, and in such case he may rescind, but the right does not exist in the case of an executed contract. In that case he can only sue for damages. Such is undoubtedly the rule when no fraud is charged; but when that exists, then, whether it is executed or executory, the party may rescind; and in *Flight* v. *Booth* it was held that " it was a safe rule to adopt that when the misdescription, although not proceeding from fraud, is in a material and substantial point so far affecting the subject matter of the contract, that it may reasonably be supposed that but for such misdescription the purchaser might not have entered into the contract, in such case the contract is altogether avoided."

If the contract could be rescinded in that case, why not in this ? A false description is but a false representation. The effect in both is to defraud, and the rights of the injured party should be the same.

I have already extended the discussion of the questions arising on this appeal far beyond what I intended when I began; but some of the questions are both novel and important, and rendered necessary a more extended discussion than the amount in controversy would otherwise justify.

The defendant's counsel has made no point upon the

Kelsey *v.* Northern Light Oil Company.

refusals to charge as requested, and I do not, therefore, deem it necessary to consider them.

With the most profound respect for the opinion of my brother Peckham, I cannot concur with him in his opinion, that when a man is led into the purchase of stock of a corporation, on the representation that it owns or will own property that would make the stock valuable, and without which it would not be, he must retain his stock and submit to the wrong, although it turns out that it never acquired such property, and the stock is not valueless, but of vastly less value than it would have been had the property been acquired.

Brother Peckham seems to think that because the wells in the oil region were uncertain, as to the quantity they would yield, and the length of time they furnish oil, therefore the representation must be held to be matter of opinion merely, and hence the defendant not liable. If the representation relied on was as to the quantity of oil to be produced, or the durability of the well, he would probably be right; but that is not the representation. It is that *the company owns or will acquire wells* that *are yielding* a certain number of barrels per day. That representation is untrue, and hence the plaintiff has not received stock of the value it would have been had the company acquired the property.

Nor is it an answer, now, that the property to be acquired, and not acquired, has proved to be of little or no value. The rights of the parties were fixed at the time of making the contract, or at latest, when it was ascertained that the title could not be acquired. The right then attached, to rescind the contract, and it has never been waived or abandoned.

Brother Peckham thinks that the plaintiff is not damnified, because $75,000 was retained in the treasury to make good the loss of the Hammond well. It would be interesting to know how that $75,000 got into the treasury, if

it be true that the land was paid for in stock. Why was not the stock kept back by money? Who fixed the price of the Hammond well, which was, by the prospectus, by far the best of all the wells mentioned in it?

But I am not aware that a defendant who is sued for fraudulent representations can escape liability by showing that although they were false, yet he deposited money to an amount equal to the value of the property as to which the representation was made. The plaintiff had the right to have the identical property which it was represented the company would own or did then own; and he never authorized any person to settle with the wrongdoer for the depreciation of the value of his stock.

I am in favor of affirming the judgment.

Judgment reversed.

[NEW YORK GENERAL TERM, June 7, 1869. *J. F. Barnard, Mullin* and *Peckham,* Justices.]