[FRAUD AND CONCEALMENT IN CONTRACTS.  PRACTICE.]

SOLOMON ETTING, *Plaintiff in Error*,

v.

The PRESIDENT, DIRECTORS AND COMPANY OF THE BANK OF THE UNITED STATES, *Defendants in Error*.

Although a Judge may refuse to declare the law to the jury on a hypothetical question not warranted by the testimony in the cause, yet, if he proceeds to state the law, and states it erroneously, his opinion may be revised in the Court above ; and if it can have had any influence on the jury, their verdict will be set aside.

Although it is the province of the Court to construe written instruments, yet, where the effect of such instruments depends, not merely on the construction and meaning of the instrument, but upon collateral facts *in pais*, and extrinsic circumstances, the inferences of fact to be drawn from them are to be left to the jury.

Where the Court is equally divided in opinion upon a writ of error, the judgment of the Court below is to be affirmed.

*Quære*, What concealment, or suppression of material facts, in a contract, where both parties have not equal access to the means of information, will avoid the contract ?

ERROR to the Circuit Court of Maryland.

This was an action of assumpsit brought in the Court below by the defendants in error, against the plaintiff in error, Etting, as the endorser of the promissory note of James W. M'Cullough, under the following circumstances.

In the year 1819, the president of the Branch Bank, established at Baltimore, his partner in trade, M'Cullough, the cashier of the branch, and Williams, one of the directors of the parent

1826.

Etting
v
The Bank of
the U. S.

bank, had contracted a debt to the bank to the amount of 3,497,700 dollars. The directors at Philadelphia, in consequence of some information which they had received respecting it, passed a resolution, on the 19th of February, 1819, calculated to draw forth a complete statement of the case, with all its circumstances. This resolution brought the papers it required, and, also, brought the president and cashier to Philadelphia, who attended for the purpose of making verbal explanations. These were received, and the case was referred, on the 16th of March, to a committee, whose report was made on the 30th of the said month. It appeared by this report, that the securities offered for the debt consisted of 20,848 shares of the stock of the bank, of 26,550 shares previously pledged for very large sums in London, Liverpool, New-York, and Boston, the amount of which was not stated, and the personal liability of the debtors themselves. The report stated, " As the result of many conferences, and a good deal of deliberation," an offer on the part of the debtors to give additional security for 900,000 dollars, payable in five years by annual instalments. A part of the proposed arrangement was, that the shares previously pledged in London, and elsewhere, should be liberated from the claim of the bank, and that the separate liability of each for 300,000 dollars, should be received, instead of the joint liability of all for 900,000 dollars. This offer, with some modifications, was accepted by the bank. A part of the security offered by M'Cullough, were

sixteen merchants of Baltimore, who were to
become bound for 12,500 dollars each. The
committee recommended the acceptance of these
terms, and also recommended, that the sufficien-
cy of the security offered by Williams, and
M'Cullough, including the sixteen sureties pro-
posed by M'Cullough, should be referred to the
members of the board residing in Baltimore.
This course was adopted by the bank, and the
committee of members residing in Baltimore re-
ported on the whole subject. Of the sixteen
names proposed for their consideration, three
were withdrawn, and three were objected to.
Among those who were accepted was Etting,
the plaintiff in error. The negotiations, investi-
gations, and arrangements, for the completion of
the business, were some time in progress. Pro-
positions were made for changes of the securi-
ties, and, on the 10th of May, the president of
the bank addressed a letter to the committee in
Baltimore, urging them to bring it to an imme-
diate close. On the 14th of May, the committee
at Baltimore reported the documents which had
been executed in pursuance of previous arrange-
ments made with the debtors, a report of which
was made by the committee at Philadelphia, on
the 17th of the same month, and, on the 18th,
M'Cullough was removed from the office of
cashier, which he had held from the first esta-
blishment of the bank. It was admitted, that he
was a young man worth nothing, who had a fa-
mily, and whose salary as cashier was 4,000 dol-
lars.

When the n ite endorsed by Etting, the plaintiff in error, fell due, he refused to pay it; on which it was protested for non-payment, and this suit was brought by the bank. At the trial in the Court below, the whole matter was given in evidence, and the Court was moved to instruct the jury on the law which would arise on the facts of the case, and the inferences which the jury might draw from those facts. The counsel for the plaintiffs moved the Court to instruct the jury, that if they should be of opinion, from the evidence, that the defendant, Etting, without any communication with the plaintiffs, but on the application of M'Cullough only, agreed to become his endorser, under the arrangement made between him and the plaintiffs, although they should be satisfied, from the evidence offered by the defendant, that the said M'Cullough deceived the said Etting; that it was known to the bank before, or pending the negotiation, that the debt from M'Cullough, or the greater part thereof, had grown out of his unauthorized and fraudulent appropriation of their funds to his own use, which knowledge the bank did not promulgate, though they contemplated his removal as soon as the securities should be given, in conformity with the arrangement which had been made; that the defendant endorsed the note in ignorance of any fraud on the bank, or of any abuse of his office of cashier, or of any probability of his removal from the said office; that, had the defendant known these circumstances, he would not have endorsed the said note; and that the bank fore-

bore to promulgate either the information they
possessed, or their intention to remove the said
M'Cullough, under the im ression, that the dis-
closure would increase the difficulty of the said
M'Cullough in procuring security, if not render
it impossible for him to procure it ; yet, if they
shall also be of opinion, that the defendant,
without making any inquiries of the plaintiffs
on the subject of such information and inten-
tion, or holding any communication with them
on the subject of his intended endorsement,
did, of his own accord, on the application of the
said M'Cullough, and for the purpose of giving
effect to the said arrangement, endorse the said
note on which this action is brought, that there
was nothing in the evidence so given by the de-
fendant, to affect the plaintiff's right of recovery
in this action. That, in order to vitiate the said
note and endorsement in law, and to bar the
plaintiff's right of recovery thereon, on the
ground of a fraudulent misrepresentation, or
fraudulent concealment of circumstances known
to them, and unknown to the defendant, it was
incumbent on the defendant to show that he ap-
plied to the plaintiffs for information, or held some
communication with them for the purpose of re-
ceiving such information, and that on such appli-
cation or communication, the plaintiffs either
misrepresented or concealed such circumstances ;
and that, in the absence of such proof, there was
nothing in the facts so given in evidence by the
defendant, to affect the right of recovery in the
action.

The Court gave the instruction as asked, to which an exception was taken.

The counsel for the defendant then moved the Court for instructions, that if the jury should draw from the evidence-certain inferences which were stated, the plaintiffs were not entitled to recover. These inferences were, that the bank was fully informed in March, 1819, of the fraudulent conduct of M'Cullough, the extent of his misapplication of their funds, and of his insolvency ; that on receiving this information, they became satisfied of his unfitness to continue in office, and determined to remove him. That, however, they continued him in office until the 18th of May, carefully concealing the circumstances, and their determination, for the purpose of obtaining security of the debt due to them from the said M'Cullough, one of which so contemplated securities was the note in question. That the defendant was, to the knowledge of the plaintiffs, ignorant of M'Cullough's breach of duty, and of the determination to remove him, and endorsed the note by reason of that ignorance.

The Court refused to give this instruction, unless the jury should be further of opinion, that the defendant was led into this state of ignorance in consequence of inquiries made by him of the plaintiffs, or of some previous communication between them and him.

On the farther application of the counsel for the defendant, praying the Court to instruct the jury, that on the statement and evidence contain-

ed in the bills of exceptions, if the jury believed
the same, the plaintiffs were not entitled to re-
cover; the Court refused to give the instruction
asked, and directed the jury, that on the evidence
aforesaid the plaintiffs were entitled to recover.

Judgment was rendered for the plaintiffs in the
Court below, and the cause was brought by writ
of error to this Court.

The cause was argued by Mr. *Webster* and
Mr. *Taney*, for the plaintiff in error, and by the
*Attorney General* and Mr. *Emmett*, for the de-
fendants in error. The discussion took a wide
range upon the doctrine of misrepresentation and
concealment in contracts; but as that point was
not determined by the Court, it has not been
thought necessary to report any thing more than
a concise summary of the arguments of coun-
sel.

The following points were made for the plain-
tiff in error, upon the instructions given and re-
fused by the Court below.

1. That the concealment of the facts and cir-
cumstances above mentioned, or the concealment
of any one of them, whereby the plaintiff in error
was induced to enter into the contract in ques-
tion, was a fraud upon him, and vitiated the con-
tract.

2. That if the mere omission to communicate
the said facts and circumstances would not be a
fraud, yet, the act of the defendants in error, of
continuing M'Cullough in office, in order to give

VOL. XI.                    9

*[margin: 1826. Etting v. The Bank of the U. S.]*

*[margin: March 9th and 10th]*

him credit, and thereby to procure the security in question, by which means the plaintiff in error was deceived, and induced to endorse the said note, was a fraud upon him, and vitiated the contract.

3. That the continuance of M'Cullough in the office of cashier, from the 16th of March, 1819, (when his misconduct in office came to the knowledge of the president and directors of the bank, until the 18th of May following, when he was dismissed, was a violation of the duty of the president and directors to the government of the United States, and to the public, and, therefore, vitiated any contract obtained by means of such continuance in office.

Upon the first point, it was argued, that the concealment of material circumstances, known to one party, and unknown to the other, vitiates the contract.[a]    In the opinion given by the Court below, the principle was admitted, but with this qualification, that it must be *on inquiry or communication, for the purpose of information.*   In this view of the subject, the only question would be, whether the rule is subject to this limitation, i. e. of inquiry or communication for the purpose of information.    But an exception to the rule was supposed to exist, and it might be said, that a party is not bound to communicate circumstances ex-

---

*a* 1 *Com. Contr.* 88.   1 *W. Bl. Rep.* 465.   1 *Fonbl. Eq.* 379. note (h.) *Dougl.* 18.   Hill v. Gray, 1 *Starkie's N. P. Rep.* 434.   *Verplanck on Contracts, passim.* 8 *Mass. Rep.* 408.

trinsic to the contract, and that the circumstances
concealed were *extrinsic.* If this proposition
were true, although there had been inquiry and
communication, yet the facts themselves being
of such a character that they need not to have
been disclosed, that alone created the exception
to the rule. But, it was insisted, the exception
ought to be confined to those facts which are
equally open to both parties. The ground upon
which Etting undertook for M'Cullough's per-
formance, was his confidence in his supposed in-
tegrity, and in his resources and credit derived
from his connexion with the bank. No case
could be found, which states, that *inquiry* is ne-
cessary to create the obligation to disclose mate-
rial facts, which are not equally within the know-
ledge of both parties. The fraud consists in
dealing with the party in ignorance, and leaving
him so. It is not necessary that the other party
should have created the false impression, or in-
tended to have created it. It is sufficient that he
knows it, and takes advantage of it.[b] Undue
concealment consists in the suppression of a ma-
terial fact, not in the knowledge of both parties,
and not of a nature to be equally known to both
parties, in a case where confidence s reposed
that the fact does not exist. In *Laidlaw* v. *Or-*

1826.

Etting
v.
The Bank of
the U. S.

a Laidlaw v. Organ, 2 *Wheat. Rep.* 183.

b Stuart v. Wilkins, *Dougl.* 18. Pidcock v. Bishop, 3 *Barnw. & Cresw.* 605. Smith v. Bank of Scotland, 1 *Dow. Parl. Rep.* 272. 1 *Brod. & Bingh.* 289. Jackson v. Buchaire, 3 *Term Rep.* 551.

1826.     *gan*, the intelligence was of a nature to be
equally known to both parties, and it was not a
fact respecting which confidence is generally re-
posed that it will be disclosed.

Etting
v.
The Bank of
the U. S.

On the second point, it was argued, that here
was an act done in order to give a false credit,
and it did give false credit.   It was a positive
deceit by acts, though not by words.   It was
asked, whether a party might lawfully deceive in
one way, and not in the other ?   The law is more
consistent with common justice, and says you
must do nothing to deceive.[a]   It was a case of
industrious concealment.[b]   By continuing the
cashier in office, the defendants in error gave
him a fictitious credit which they knew did not
belong to him.   It was analogous to the ordinary
case of the fraudulent misrepresentation of the
credit of another.[c]   It had been said there was
no inquiry.   Why was there none ?   Because,
the very continuance of the officer in office, was
evidence that they thought him honest.   It
might, perhaps, be contended, that nothing was
positively said or done by the bank calculated to
mislead the surety.   But silence, or an omission
to act, may, in many cases, as effectually deceive
the party, as the most explicit declaration, or the
most positive acts.   Continuing the cashier in
office was equivalent to a *suggestio falsi.*[d]

a  2 *Wheat. Rep.* 295.   1 *Dow. Parl. Rep.* 294, 295.   2 *Term Rep.* 587.

b  *Sugd. Vend.* 226. 227. and the cases there collected.

c  Paisley v. Freeman, 3 *Term Rep.* 51.

d  In the case of *Smith* v. *Bank of Scotland,* (1 *Dow. Parl. Rep.* 294.) Lord ELDON spake of another case which had come

On the third point, the peculiar character of the bank was insisted on, as an instrument of the government, not created for its own profit merely, but as a means to aid the financial operations of the government [a] Both the public and the government were deceived and injured by the misplaced confidence of the bank in their cashier. It was their duty to have removed him the instant his default was discovered. It is contrary to the policy of the law to enforce a contract obtained by a breach of duty to the public. The bank may be considered as a public officer, and is bound by the same obligations, and owes the same duties, as any other public officer. But, would it be pretended, that a public officer could keep an unworthy agent or deputy in office, for

1826.

Etting

v.

The Bank of the U. S.

before him. (*Maltby's case.*) " A clerk to the Fishmonger's Company had incurred a considerable debt. The deficit had been increasing from year to year, and was at length carried beyond what the company were likely to recover. They demanded additional security, which he procured. The case had come before him only upon motion, but he had thought a good deal upon it, and the light in which it appeared to him was this: If he knew himself to be cheated by an agent, and, concealing that fact, applied for security, in such a manner, and under such circumstances, as held him out to others as one whom he considered as a trustworthy person, and any one acting under the impression that the agent was so considered by his employer, had become bound for him ; it appeared to him, that he could not conscientiously hold that security. He was, then, of opinion, that the Fishmonger's Company could not hold their security. He did not know what had become of the case afterwards, but, he believed, that his opinion was submitted to, and that no further proceedings were had. He had since reconsidered the matter, and still retained his former opinion, and would act upon it judicially, if occasion offered."

[a] M'Cullough v. Maryland, 4 *Wheat. Rep.* 411. 422.

the mere purpose of securing a debt due to him-self?

On the part of the defendants in error, it was stated, that the rule is accurately laid down by Mr. *Fonblanque*, as to what circumstances a contracting party is bound to disclose : " If a man, by the suppression of a truth *which he was bound to communicate*, or by the wilful suggestion of a falsehood, be the cause of prejudice to another, *who had a right to a full and correct representation of the fact*, it is certainly agreeable to the dictates of a good conscience, that his claim should be postponed to that of the person whose confidence was induced by his representation."[a] Under certain modifications, and with certain exceptions, the party is bound to communicate all circumstances *intrinsic* in the contract itself; all those circumstances which enter into the contract as ingredients, and form constituent parts of it. But, with regard to circumstances *extrinsic* to the contract, though forming inducements to enter into it, however powerfully he may believe and know they are operating with the opposite party, he is at liberty to keep silence. Intrinsic circumstances are such, for example, as regard the quality and price of the article, which must, of necessity, enter into the inducements. Extrinsic circumstances are those considerations which form no component part of the contract itself, but which may form inducements with the party to enter into it. The distinction is founded

*a  1 Fonbl. Eq. 164.*

in reason, and is necessary to the business of life.[a]  With regard to the whole class of *extrinsic* circumstances, though, if the party undertake to disclose them, he must take care to state the truth, yet, he may maintain the most obstinate silence respecting them, and the contract will still be valid.

1826.

Etting
v.
The Bank of
the U. S.

As to the objection, that the rule must be received with the qualification, that the facts are equally accessible to both parties, it was said, that if by this was meant, that they must be equally accessible to both *by the use of ordinary diligence,* it could not be considered as well founded.[b]  And, if it meant nothing more than that it was physically accessible, where the party pushes his inquiries in all possible directions, and takes sufficient time to make the discovery, then it was inapplicable to any practical purpose in the business of life.  The qualification had been borrowed from the law with regard to *intrinsic* circumstances, to which it was properly applied, and transferred to *extrinsic* circumstances, to which it was wholly inapplicable.  Assuming, that, with regard to *extrinsic* circumstances, a party may conceal them without impairing the contract, there was not a feature in any one of the instructions in this case which was not justified by the operation of that principle.  The keeping the cashier in office was doing nothing.

a 2 *Wheat. Rep.* 185. note c. and the passages from Pothier there cited.

b Fox v. Mackreth, 2 *Bro. Ch. Cas.* 420.

1826.

Etting
v.
The Bank of
the U. S.

It was a mere forbearance to act. · All the cases referred to, of industrious concealment, admitted of two answers:. (1.) That the concealment was of circumstances *intrinsic* to the contract. (2.) That, in all the cases, no acts were done ·to alter the antecedent state of things for the purpose of concealment. As to the case of *Smith* v. *The Bank of Scotland,*[a] which had been relied upon as analogous to the present, it would be found that there was a positive misrepresentation on the part of the bank, they alleging that further security was wanted on account of an increase of business, when, in fact, there was a decrease. Another case from the same book might have been cited, where an attempt was made to set aside a security bond, alleged to have been obtained by unfounded representations of circumstances generally, without any direct reference to the bond, and the Court having, according to the forms of the Scottish law, appointed the sureties to say whether they would refer to the respondent's oath, " that he did *elicit* that bond ?" and the sureties having admitted, that " they never meant to say that there was any degree of personal influence with either of them *to elicit the bond of relief,*" the Court of Session pronounced in favour of the bond, which was affirmed by the House of Lords on appeal.[b] So, here, it might be asked, whether the plaintiffs below had done any thing to

*a* 1 *Dow. Parl. Rep.* 272.
*b* Webster v. Chrystie, 1 *Dow. Parl. Rep.* 247.

*elicit* the note. All that was alleged was, that
they had not communicated their intention
of removing the cashier, when they were not
asked respecting their intentions, and when it
was equally lawful for them to retain or to re-
move him. The effort on the other side is to
induce the Court to establish a new rule of law,
which, however analogous to other principles
merely applicable to the contract of insurance,
was admitted, even by the ingenious and learned
author of the treatise which had been referred
to, not to form a part of the jurisprudence of
this country.[a]

Mr. Chief Justice MARSHALL delivered the
opinion of the Court.

If this case depended on the deservedly high
character of the individuals who were engaged
on the part of the bank in the transactions in
which the suit originated; if elevation above the
possibility of suspicion that they could have me-
ditated any thing believed by themselves to be
legally or morally wrong, could decide it, this
cause would not have required the great efforts
which have been bestowed upon it. The names
which appear on this record can never be con-
nected with actual fraud; nor would any difficulty
be found in protecting them from the imputa-
tion, were it possible that it could be made. But
judicial inquiries are into the rights of the par-

1826.

Etting
v.
The Bank of
the U. S.

*March 16th.*

---

[a] *Verplanck on Contracts.*

ties; and, although high and honourable charac-ter has, and ought to have, great influence in weighing testimony in which that character is in any manner involved; yet, when the inferences from that testimony are drawn by others, and a Court is required to pronounce the law arising upon them, character is excluded from the view of the Judge, and legal principles alone can be acknowledged as his guide.

At the trial several points of law were raised by both parties, on which opinions were given, to which exceptions were taken, and the correctness of those opinions constitutes the single inquiry in this Court. [Here the learned Chief Justice stated the case, as it is stated above.]

As preliminary to the inquiry, whether the law arising on the facts, and on the inferences as-sumed in the bills of exceptions contained in the record, was correctly stated by the Court, a point has been made at the bar, which must be disposed of. It has been contended, that a Court is not bound to answer abstract or hypothetical ques-tions of law, not growing out of the testimony in the cause, which may be propounded at the bar; and, to apply this principle, it has been also con-tended, that the testimony contained in the record, and referred to in the bills of exceptions, contains nothing from which the jury could possibly draw those inferences of fact upon which the Court was asked to declare the law. That the points made in the bill of exceptions constitute a dis-tinct and totally different case from that made by the evidence.

That a Judge cannot be required to declare the law on hypothetical questions which do not belong to the cause on trial, has been frequently asserted in this Court, and is, we believe, incontrovertible.[a] The Court may, at any time, refuse to give an opinion on such a point ; and if the party propounding the question is dissatisfied with it, he may execpt to the refusal, which ex-. ception will avail him, if he shows that the question was warranted by the testimony, and that the opinion he asked ought to have been given. But, if the Judge proceeds to state the law, and states it erroneously, his opinion ought to be revised ; and if it can have had any influence on the jury, their verdict ought to be set aside.

It cannot, however, we think, be correctly affirmed with respect to the case now under consideration, that the points stated in the bills of exception have no relation to the testimony to which those bills refer. That testimony consists of various communications and reports, made to the bank, of their own transactions, and of the admissions of parties. It has been said, that this testimony is all in writing, and is to be construed by the Court; and from this proposition is deduced the corollary, that the jury was not at liberty to draw inferences from it.

Were the fact as alleged, and were it true, that the testimony is all in writing, the consequence drawn from it cannot be admitted. Conceding it to be the province of the Court to construe any particular paper which was offered in

[a] Hamilton v. Russell, 1 *Cranch's Rep.* 309. 318.

1826.

Etting
v.
The Bank of
the U..S.

evidence, the report of the 30th of March for example, and to declare the meaning of every sentence, and of the whole instrument, yet this report contains a great variety of extrinsic circumstances, suggests measures of deep interest, was followed by numerous successive acts which took place in the country, and which do not derive all their influence on the cause from the construction of the particular papers in which they are communicated, but, in a considerable degree, from their connexion with each other, from the motives in which they originate, and from the effects they were calculated to produce, and did produce, on others. These subjects are peculiarly proper for the consideration of a jury. If the testimony be examined, it will, we think, appear, that the counsel for the plaintiffs has not asked the Court to give its opinion on any inferences of fact which it was not at least possible for the jury to draw from the evidence. The knowledge of the bank is not questioned. The ignorance of Etting might be inferred from the absence of all testimony proving his knowledge that any fraud had been practised by M'Cullough. The original resolution of the bank to remove M'Cullough might be inferred from their knowledge of his unfitness for the office, and from the fact that they did remove him the instant the securities were obtained which they expected from him. The same facts might justify the inference respecting the motives which induced the bank to retain him in office until those securities were procured

We are far from saying that these inferences were

all of them such as the jury ought to have drawn. It is not difficult to perceive, that the bank might have acted on motives equally unexceptionable in morals and in law. The jury might very well have believed that the bank thought the 26,550 shares of stock were not worth more than the sums for which they were pledged, or, at any rate, were not a safe security, and might, therefore, think it advisable to relinquish that pledge, if other security could be substituted in its place. Others might estimate that stock more highly than they did, and might estimate it rightly. Friends, therefore, acting on their own judgment of the value of this stock, might be found willing to endorse the paper of Mr. M'Cullough on receiving it as a pledge. The motive, too, for retaining Mr. M'Cullough in office might be to induce him to do the bank all the justice in his power, not to induce others to endorse his notes. The whole subject was before the jury, and they might have drawn from the testimony either these inferences, or those which are stated in the bills of exceptions. The counsel for the plaintiffs, believing the law to be in their favour even upon that view of the testimony which is taken in the exceptions, and fearing that the jury, should they take that view, might find for the defendant, chose to refer the law to the Court. Whether his fears respecting the jury were well or ill founded, this cause must now be decided on the correctness of the opinion given by the Circuit Court.

In the very elaborate arguments which have

been made at the bar, several cases have been cited which have been attentively considered. No attempt will be made to analyze them, or to decide on their application to the case before us, because the Judges are divided respecting it. Consequently, the principles of law which have been argued cannot be settled ; but the judgment is affirmed, the Court being divided in opinion upon it.

Judgment affirmed.

