DYK, Circuit Judge,
dissenting in part,
with whom GAJARSA, REYNA, and WALLACH, Circuit Judges, join in full, and with whom LINN, Circuit Judge, joins
in parts I — II.
The court took this case en banc to address when absolute intervening rights arise under 35 U.S.C. § 307(b) during reexamination. In particular, the question is whether intervening rights accrue when *1366 the patentee limits the claim scope by-argument rather than by formal amendment to the claim language.
Despite the importance of the issue of intervening rights, as evidenced by the amicus briefs filed by numerous companies and organizations, the court did not seek further briefing and argument by the parties. This approach to an important issue is in my view difficult to justify. Now, remarkably, the court having affirmed the district court’s judgment by an equally divided court, goes on to opine in dictum as to the issue of intervening rights even though that issue (as discussed below) has been resolved by the affirmance and also, in the majority’s view, “is not properly before us on appeal.” Maj. Op. at 1362. This is an unusual and unfortunate approach to an important issue. This issue is likely to become even more important under the new Leahy-Smith America Invents Act (“ALA”) because of the increased availability of reexamination. The majority’s interpretation of the statute is both incorrect and certain to encourage improper strategic behavior by patent applicants. I dissent.
I
The starting point for an intervening rights determination is the meaning of the original claim language. The district court construed the key claim limitation (“bio-compatible”) of the original patent claims to require “polymers ... with low variability, high purity, and no detectable biological reactivity as determined by biocompatibility tests.” Marine Polymer Techs., Inc. v. HemCon, Inc., No. 06-cv-100-JD, 2008 WL 1995454, at *10 (D.N.H. May 6, 2008) (emphasis added). Contrary to Judge Lourie’s opinion, it seems to me that the district court’s construction was palpably incorrect and inconsistent with our established claim construction jurisprudence.
Some background is essential to an understanding of the claim construction issue. Marine Polymer asserted seven claims of U.S. Patent No. 6,864,245 (“the 245 patent”), directed to p-GlcNAc polymers, against HemCon. Independent claim 6 is representative and claims: “A biocompatible [p-GlcNAc polymer] comprising up to about 150,000 N-acetylglucosamine monosaccharides covalently attached in a |3-l->4 conformation and having a molecular weight of up to about 30 million daltons in which at least one N-acetylglucosamine monosaccharide has been deaeetylated.” 245 Pat. col.72 ll.5-10 (emphasis added). Marine Polymer acknowledges that pGlcNAc polymers had been disclosed in the prior art. The polymer also exists in nature in chitin, the chief organic structural component in the cell walls of fungi or algae and the protective shells of insects and crustaceans, but had been difficult to isolate with high purity and low variability. The '245 patent purported to disclose for the first time a “biocompatible” polymer in a purified form, along with methods for its purification from microalgae. With sufficient purity, these polymers have a number of biomedical applications, including, inter alia, as a means for the rapid control of severe blood loss. A purified polymer provides “increased effectiveness, reduced toxicity and improved bioavailability” for its biomedical applications. Id. col.5 ll.3-4.
There are substantial questions as to whether the prior art disclosed the claimed invention. That depends in significant part on the construction of the term “bio-compatible,” a term existing in each of the asserted claims. As noted above, the district court construed “biocompatible” p *1367 GlcNAc to be limited to “polymers ... with ... no detectable biological reactivity as determined by biocompatibility tests.” Marine Polymer, 2008 WL 1995454, at *10 (emphasis added).
One might at the outset be somewhat skeptical of this construction because it was not proposed by either party and was indeed contrary to the patentee’s own proposed construction. In the district court, Marine Polymer conceded that “biocompatible p-GlcNAc” could exhibit some biological reactivity, arguing that the term should be interpreted to mean “biomedically pure [p-GlcNAc] that reproducibly exhibits acceptably low levels of adverse bioreactivity, as determined by biocompatibility tests.” Claim Construction Order, Marine Polymer Techs., Inc. v. HemCon, Inc., No. 06-cv-100-JD, slip. op. at 2, 2008 WL 1995454 (D.N.H. May 6, 2008) (emphasis added). Similarly, it argued in its memorandum that its sample p-GleNAc “showed acceptably low adverse reactions” to each of the biocompatibility tests and that this construction of “biocompatible p-GlcNAc” was “fully supported” by the claims and specification. Memorandum in Support of Plaintiffs Claim Construction, Marine Polymer Techs., Inc. v. HemCoñ, Inc., No. 06-cv-100-JD, at 7, 10-11 (D.N.H. Aug. 17, 2007), ECF No. 48-1.
Whether or not Marine Polymer’s own constructions are binding,[1] the district court’s construction is in fact contrary to the specification and to the claims themselves. The specification and claims are clear that “biocompatible” p-GleNAc encompasses polymers that exhibit some biological reactivity. The specification “is the single best guide to the meaning of a disputed term,” Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed.Cir.2005) (en banc), and may define a term explicitly or by implication, Irdeto Access, Inc. v. EchoStar Satellite Corp., 383 F.3d 1295, 1300 (Fed.Cir.2004).
Here, the specification defines “biocompatible” in a manner directly contrary to the district court’s construction of “no detectable biological reactivity.” The specification first discusses the concept of bio-compatibility in the Detailed Description of the Invention, stating that “[t]he p-GlcNAc of the invention exhibits a high degree of biocompatibility.” '245 Pat. col.10 ll.49-50. The specification does not provide at this point what constitutes an acceptably high degree of biocompatibility, but it discloses that “[b]iocompatability may be determined by a variety of techniques, including, but not limited to such procedures as the elution test, intramuscular implantation, or intracutaneous or systemic injection into animal subjects.” Id. col.10 ll.50-53. Each of these four “biocompatibility tests” is later described in detail, including the particular materials, methods, and conditions to properly perform each test on a p-GleNAc sample. The specification also discusses the results of each of the four tests, and specifically defines what constitutes “meet[ingj” the requirements of the particular “biocompatibility test.” See id. col.42 31.42-43. Judge Lourie’s opinion itself concedes that the specification contemplates non-zero “passing” scores on the biocompatibility tests. See Lourie Op. at 1358-59.
Notably, for each of the four tests, the specification does not require that there be no biological reactivity but provides that the test is satisfied where at least some reactivity is present. For example, with respect to the elution test, the specification states that “[tjhe test article (i.e., p *1368 GlcNAc) meets the biocompatibility test if none of the cultures treated with the test article show a greater than mild reactivity.” 245 Pat. col.42 ll.41-43 (emphasis added). Likewise, the specification explains that the biocompatibility test using the other methods is met even if the polymer exhibits some biological reactivity. See id. col.43 ll.54-60, col.44 ll.25-26, col.45 ll.41-43. Nowhere does the specification disavow or disclaim from the scope of the claims polymers exhibiting these levels of reactivity. If a polymer exhibiting some reactivity nonetheless meets the specification’s explicit requirements for “biocompatibility,” it cannot be that such polymer is not “biocompatible” within the meaning of the claims. Thus, the specification contemplates some level of reactivity that is compatible with use in biomedical applications.
If this description of biocompatibility in the specification were not enough, the presence of six independent claims in the original patent dictate that the “biocompatible” limitation allow some exhibition of reactivity. Six dependent claims in the original patent specifically required that the “biocompatible” p-GlcNAc have an elution test score of either one or two, which correspond to “slight” or “mild” reactivity respectively and is directly inconsistent with a construction requiring no reactivity. '245 Pat. col.42 ll.50-55. If “biocompatible” requires that there be no reactivity, but these dependent claims require slight or mild reactivity, they are nullified and become utterly meaningless. Marine Polymer itself concedes that these six claims were rendered meaningless by the district court’s construction, and that “the dependent claims requiring non-zero elution test scores conflict with [the district court’s] construction.” Appellee’s Br. 28.
Where a particular construction of an independent claim would nullify claims that depend from it, the doctrine of claim differentiation creates a presumption that such a construction is improper. See Liebelr-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 910 (Fed.Cir.2004). We adopt a construction of a term which renders claims invalid or meaningless when it is the “only claim construction that is consistent with the claim’s language and the written description.” Rhine v. Casio, Inc., 183 F.3d 1342, 1345 (Fed.Cir.1999) (emphasis added). In other words, this presumption can be overcome only where a contrary construction is “dictated” — i.e., compelled — by the written description or prosecution history. Seachange Int’l, Inc. v. C-COR, Inc., 413 F.3d 1361, 1369, 1370-72 (Fed.Cir.2005) (holding that the presumption established by claim differentiation was rebutted because the written description “consistently” referred to the claim term in a specific manner and arguments made during prosecution amounted to a clear and unambiguous disclaimer of claim scope). Here, there is an alternate claim construction, one construing “bio-compatible” to mean “little or no detectable reactivity,” which preserves the validity of these six dependent claims. Nothing in the written description or prosecution history overcomes the presumption by dictating or compelling the conclusion that “biocompatible” is limited to exhibiting “no detectable reactivity.”
In supporting the district court’s claim construction Judge Lourie’s opinion ignores or dismisses much of this compelling evidence. The opinion suggests that the examiner’s adoption of the district court’s construction supports the correctness of that construction. Lourie Op. at 1359 n. 5. Quite the contrary. During reexamination, Marine Polymer asked the examiner to adopt the district court’s construction of “biocompatible” in evaluating whether the *1369 claims were invalid as anticipated or obvious. The examiner, however, rejected the district court’s construction and held that the “biocompatibility” limitation was not limited to no reactivity but instead permitted “little or no detectable reactivity.” J.A. 39503. The examiner explained that this definition “avoids creating the situation where claims 4, 5, 13, 14, 21 and 22 would be improper for failing to further limit the claims from which they depend.” J.A. 39504. Only after these dependent claims were canceled to create consistency with the district court’s construction of “biocompatible” did the examiner accept the district court’s construction. The examiner explained that “[w]ith the cancellation of the claims which required that the elution test scores were 1 or 2, the Examiner now agrees with the court’s definition of the term biocompatible.” J.A. 39481.
Apart from its reliance on the examiner, Judge Lourie’s opinion rests its conclusion as to the correctness of the district court’s construction almost exclusively on the fact that there are two instances in the entire specification where it refers to the pGlcNAc “of the invention.” See Lourie Op. at 1357-59. These two references, however, do not limit the scope of the term “biocompatible.” With respect to the first, discussed above, the specification simply notes that the “p-GlcNAc of the invention exhibits a high degree of biocompatibility.” '245 Pat. col.10 11.49-50 (emphasis added). There is no indication in the specification that a high degree of biocompatibility is achieved only where there is no reactivity. The passage suggests the opposite. With respect to the second, the specification’s description of the p-GlcNAc “of the invention” was made in the context of a specific example — one of eighteen in the specification. Judge Lourie’s opinion leaves out highly pertinent language in quoting this portion of the specification. The specification explicitly states that
[i]n this Example, ... the p-GleNAc of the invention exhibits no detectable biological reactivity.
Id. col.41 11.66-67 (emphasis added). Judge Lourie’s opinion leaves out the “in this Example” language. This reference does not suggest that the invention always “exhibits no detectable biological reactivity”; rather, that it does so “in this Example.” [2] The mere fact that the p-GlcNAc tested in this example in the specification showed no biological reactivity, without more, cannot be sufficient to limit the claim term “biocompatible” to polymers exhibiting no detectable biological reactivity.
The approach in Judge Lourie’s opinion of interpreting a claim limitation based solely on a single example from the specification is an approach we have repeatedly rejected. See, e.g., Silicon Graphics, Inc. v. ATI Techs., Inc., 607 F.3d 784, 792 (Fed.Cir.2010) (“A construing court’s reliance on the specification must not go so far as to import limitations into claims from examples or embodiments appearing only in a patent’s written description unless the specification makes clear that the patentee intends for the claims and the embodiments in the specification to be *1370 strictly coextensive.” (internal quotation marks omitted)); Howmedica Osteonics Corp. v. Wright Med. Tech., Inc., 540 F.3d 1337, 1345 (Fed.Cir.2008) (“[W]e have repeatedly held that the fact that the specification describes only a single embodiment, standing alone, is insufficient to limit otherwise broad claim language.”). We have “cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.” Tex. Instruments, Inc. v. U.S. Int’l Trade Comm’n, 805 F.2d 1558, 1563 (Fed.Cir. 1986). Indeed, the “[v]aried use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition.” Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 991 (Fed.Cir.1999). This court has never, on such scant evidence as exists here, found that a single embodiment disclosed in a patent limited the scope of the claims.
Judge Lourie’s new approach to claim construction would enable patentees to eliminate questions of validity by narrowing claims in accordance with a preferred embodiment or single example, while also allowing alleged infringers to narrow claims beyond their valid scope to avoid infringement. That approach cannot be correct.
II
Under the correct claim construction, ignoring for a moment the issue of intervening rights, HemCon at a minimum would be entitled to a new trial on all issues related to the validity of the original patent claims. The jury was specifically instructed under the incorrect claim construction and answered questions on the jury verdict form directly related to this construction. J.A. 111 (asking jury whether prior art discloses “having no detectable biological reactivity as determined by biocompatibility tests”). Moreover, after trial, the district court denied HemCon’s motion for JMOL and/or a new trial on anticipation and obviousness because HemCon’s expert’s opinions about the pri- or art “were based on the wrong definition of biocompatibility,” Marine Polymer Techs., Inc. v. HemCon, Inc., No. 06-cv-100-JD, 2010 WL 2902258, at *3 (D.N.H. July 21, 2010), and because the disputed prior art “did not disclose p-GlcNAc with no detectable biological reactivity as determined by biocompatibility tests,” id. at *4. See also id. at *8 (“[Bjecause none of the cited prior art disclosed the properties of biocompatible p-GlcNAe, as claimed by the '245 patent, the evidence at trial did not support findings for obviousness.”). This reliance on this incorrect claim construction alone warrants a new trial on these issues, putting to one side the issue of intervening rights. HemCon should at a minimum be permitted to defend itself against claims of infringing the original patent by attacking its validity under a proper claim construction.
Ill
A
I turn then to the question of intervening rights. While the judgment of the district court is affirmed by an equally divided court, the district court rendered no judgment on the question of intervening rights, and therefore there is nothing to affirm in that respect. Nonetheless, I agree with Judge Lourie that the effect of the equally divided affirmance is that the district court’s claim construction is binding on the parties as if the district court’s decision had never been reviewed. Durant v. Essex Co., 7 Wall. 107, 74 U.S. 107, *1371 113, 19 L.Ed. 154 (1868) (holding that an affirmance by an equally divided court “is as conclusive and binding in every respect upon the parties as if rendered upon the concurrence of all the judges upon every question involved in the case”).[3] The result is that there can be no intervening rights. In other words, under the district court’s incorrect claim construction, now binding on the parties as a result of the affirmance of the district court’s judgment, the original and reexamined claims are identical in scope, and there is thus no issue of intervening rights and no need for the majority to offer “an alternative ground for decision.” Remarkably, the majority goes on to legislate an interpretation of the intervening rights statute. This is, to say the least, an unusual approach. It is particularly odd because the majority thinks that the issue is not properly before us (even if the district court’s claim construction was wrong) because the intervening rights issue was not addressed by the district court.
In my view the issue is properly before us. Here, while the district court entered judgment on September 22, 2010, and HemCon filed its Notice of Appeal to this court on September 24, 2010, the examiner did not issue the Notice of Intent to Issue an Ex Parte Reexamination Certificate until November 3, 2010, well after the appeal to this court. The majority offers no reasons why we should not consider the changes to a patent effected by reexamination. Just as we are obligated to take account of intervening changes in law that affect an appeal, see Bradley v. Sch. Bd. of City of Richmond, 416 U.S. 696, 714-15, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 542-43, 61 S.Ct. 347, 85 L.Ed. 327 (1941), we are obligated to take account of changes to a patent that occur during the pendency of a case on appeal, see Watts, Watts & Co. v. Unione Austriaca Di Navigazione, 248 U.S. 9, 21, 39 S.Ct. 1, 63 L.Ed. 100 (1918) (holding that “eourt[s] must consider the changes in fact and in law which have supervened since the decree was entered below”). Ample authority, uncontradicted by the majority, supports the original panel’s approach of addressing the issue of intervening rights,[4] and the majority has offered no support for its position that a court cannot take judicial notice of changes that occur while the case is pending on appeal.
The majority, though believing that the issue is not properly before us and that the issue is resolved by the district court’s claim construction, excuses its discussion of intervening rights by the fact that the original panel opinion “dealt extensively *1372 with this issue,” and thus this court must “decide the case as we find it and clarify the law.” Maj. Op. at 1365. But the panel opinion- has been vacated, and, if the issue is not in fact properly before us, and is unnecessary in any event, there is no possible reason for addressing it. If this were not enough, the Supreme Court has repeatedly counseled against writing opinions where a judgment has been affirmed by an equally divided court,[5] a practice that the- majority here disregards.
B
On the merits of the intervening rights issue, the majority is incorrect as a matter of statutory interpretation. Section 307(b) provides:
Any proposed amended or new claim determined to be patentable and incorporated into a patent following a reexamination proceeding mil have the same effect as that specified in section 252 of this title for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim, or who made substantial preparation for the same, prior to issuance of a certificate under the provisions of subsection (a) of this section.
35 U.S.C. § 307(b) (emphasis added). Section 307(b) thus specifically incorporates the intervening rights provisions of reissued patents found in section 252. Congress was explicit that section 307(b) should be interpreted to be identical in scope to section 252:
Subsection 307(b) provides intervening rights similar to those provided by patent law section 252 with respect to reissued patents. Thus, a person practicing a patented invention would not be considered an infringer for the period between issuance of an invalid patent and its conversion through reexamination to a valid patent.
H.R.Rep. No. 96-1307(1), at 8 (1980), 1980 U.S.C.C.A.N. 6460, 6467 (emphasis added).[6] Thus, the “amended or new” lan *1373 guage in section 307(b) was clearly intended to have the same meaning as “substantially identical” in section 252. The focus is on whether the old and new claims are “substantially identical.” In another case analyzing intervening rights related to a reexamined patent, this court explained:
A patentee of a reexamined patent is entitled to infringement damages, inter alia, for the period between the date of issuance of the original claims and the date of issuance of the reexamined claims if the original and reexamined claims are “identical.” Reexamined claims are “identical” to their original counterparts if they are “without substantive change.” Furthermore, in determining whether substantive changes have been made, we must discern whether the scope of the claims are identical, not merely whether different words are used.
Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1346 (Fed.Cir.1998) (internal citations omitted) (first and third emphases added).
Here, the original and new claims are not “substantially identical.” During reexamination the patentee agreed, by both argument and by amending the claims to cancel six dependent claims, that the term “biocompatible” should be construed to mean “no detectable biological reactivity.” In doing so, as discussed above, the patentee adopted a construction that was different than the correct construction of the original claims, namely that “biocompatible” meant, inter alia, “little or no detectable reactivity.” The effect was to narrow the claims and protect them from a finding of invalidity.
As the majority recognizes, see Maj. Op. at 1363-64, it is well established that statements during prosecution or reexamination of a patent, as well as additions or deletions of claims to overcome rejections, can change the meaning of a claim term that would ordinarily be construed otherwise. See Am. Piledriving Equip., Inc. v. Geoquip, Inc., 637 F.3d 1324, 1336 (Fed.Cir. 2011); CIAS, Inc. v. Alliance Gaming Corp., 504 F.3d 1356, 1362-63 (Fed.Cir. 2007); C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 867-69 (Fed.Cir.2004); Cole v. Kimberly-Clark Corp., 102 F.3d 524, 532 (Fed.Cir.1996). Here, although identical in language, the claims of the patent after reexamination were not identical in scope for purposes of intervening rights because they were “substantively changed” during reexamination.
The majority makes much of the difference in language between sections 307(b) and 252, pointing out that section 307(b) includes the language “amended or new claims.” The majority limits an “amended” claim under section 307(b) to a situation in which the claim language itself is changed. This interpretation ignores the statute’s language, its purpose, and the history of intervening rights.
Because the statute does not define “amended,” this term is “assumed to bear [its] ‘ordinary, contemporary, common meaning.’ ” Walters v. Metro. Educ. Enters., Inc., 519 U.S. 202, 207, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997) (quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P’ship, 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)). While “amend” may often connote an actual change in language,[7] that is not the only meaning of the term “amend.”
*1374 There are a number of cases decided in similar contexts that make clear that a written document can be “amended” without a language change. For example, National Knitwear Manufacturers Ass’n v. Consumer Product Safety Commission, 666 F.2d 81 (4th Cir.1981), is quite similar to this case. In National Knitwear, the Flammable Fabrics Act required the Consumer Product Safety Commission to comply with specific procedures, in addition to those under the Administrative Procedure Act, in order to issue “a new or amended flammability standard.” 15 U.S.C. § 1193 (1976) (emphasis added). The flammability standards for children’s sleepwear included a definition of “Children’s [s]leepwear” that specifically excluded “underwear.” 16 C.F.R. § 1615.1(a) (1980). Thereafter, the Commission issued a statement, without complying with the Act, indicating that “despite a garment’s being labeled as underwear and unsuitable for sleepwear, the Commission may bring an enforcement action if it believes that the garment is intended to be worn primarily for sleeping or that it has been promoted as sleepwear.” Nat'l Knitwear, 666 F.2d at 83. The Fourth Circuit held that the Act had been violated because, although the text of the flammability standards had not changed, “the Commission ha[d] in effect amended the standard despite the express exclusion of underwear from the definition of sleepwear.” Id. at 84 (emphasis added). Just as the standard in National Knitwear was “amended” by an agency statement, so here the claims have been “amended” by a disclaimer in the reexamination.
In many other contexts the word “amend” has been interpreted as not requiring an explicit language change. In the context of the Administrative Procedure Act, amending an interpretive rule can be considered “amending ... a rule” under section 551(5), thus requiring notice and comment, even if there is no alteration in the language of the rule itself. United States v. Magnesium Corp. of Am., 616 F.3d 1129, 1139 (10th Cir.2010). As the Tenth Circuit has held, “if an agency amends its interpretation of a rule, it is effectively amending the rule itself.” Id. (internal quotation marks omitted); see also Jerri’s Ceramic Arts, Inc. v. Consumer Prod. Safety Comm’n, 874 F.2d 205, 206 (4th Cir.1989) (finding that an agency “interpretation” was in fact a substantive “amendment” to the Small Parts Rule, and thus the agency violated the APA). Legal instruments can often be constructively or effectively amended without changing literal text. See, e.g., Chamberlain Group, Inc. v. Skylink Techs., Inc., 381 F.3d 1178, 1189 (Fed.Cir.2004) (“For the purpose of determining Federal Circuit jurisdiction, we do not differentiate between actual and constructive amendments [to the complaint].”); see also, e.g., Battoni v. IBEW Local Union No. 102 Emp. Pension Plan, 594 F.3d 230, 235 (3d Cir.2010) (constructive amendment to pension plan); United States v. Starr, 533 F.3d 985, 997 (8th Cir.2008) (constructive amendment to a criminal indictment); S. Colo. MRI, Ltd. v. Med-Alliance, Inc., 166 F.3d 1094, 1099 (10th Cir.1999) (“By expressing an intent to be bound on July 7, 1993, the parties implicitly ... amended any prior [written] agreement that an asset purchase document was necessary to complete the contract.”). A statute may also be amended without a change in language. See United States ex rel. Palmer v. Lapp, 244 F. 377 (6th Cir.1917) (finding that an act indepen *1375 dent and original in form, which in effect added a provision to an existing statute, was an “amendment” within the meaning of a reference in another act to that statute “and amendments thereto”). In general, an act that changes the substance of a statute without changing its language is commonly referred to as an “amendment by implication.” See United States v. Welden, 377 U.S. 95, 103 n. 12, 84 S.Ct. 1082, 12 L.Ed.2d 152 (1964); Agri Processor Co. v. NLRB, 514 F.3d 1, 4 (D.C.Cir.2008). Thus, the plain language of the term “amended” does not require a language change.
The history of intervening rights provisions themselves compel an interpretation of “amended” that does not require a change in the language of the claims. The doctrine of intervening rights with respect to reissued patents existed as a judicial construct since the 1800s. See generally P.J. Federico, Intervening Rights in Patent Reissues, 30 Geo. Wash. L. Rev. 603 (1961). Section 252 in the Patent Act of 1952 substantially adopted and clarified the doctrine of intervening rights as it had been interpreted and developed by the courts. See H.R.Rep. No. 82-1923, at 8 (1952); see also Federico, supra, at 629-30. Courts for years have understood that the specification and the claims together act to define an invention. The Supreme Court recognized that the scope of patents could be changed by an amendment to the specification where there is no formal amendment to the claim. See, e.g., Russell v. Dodge, 93 U.S. 460, 463, 23 L.Ed. 973 (1876) (noting that a specification might “be substantially changed, either by the addition of new matter or the omission of important particulars, so as to enlarge the scope of the invention as originally claimed”).
The Supreme Court made clear that a change in the specification broadening the scope of the patent, just as a change to claim language, could lead to intervening rights. For example, in Battin v. Taggert the Court noted that
[wjhether the defect be in the specifications or in the claim ..., the patentee may surrender his patent, and, by an amended specification or claim, cure the defect.... But where the specification or claim is made so vaguely as to be inoperative and invalid, yet an amendment may give to it validity, and protect the rights of the patentee against all subsequent infringements.
58 U.S. 74, 83, 17 How. 74, 15 L.Ed. 37 (1854) (emphasis added). Similarly, in a case where a patentee had amended the specification during reissue by, inter alia, inserting an additional figure, one court held that “[t]he law does not permit such an enlargement of the original specifications as will interfere with other inventors who have acquired intervening rights.” Ficklen v. Baker, 47 App. D.C. 587, 596 (D.C.Cir.1918) (quoting Manly v. Williams, 37 App. D.C. 194, 201 (D.C.Cir. 1911)). Thus, prior to Congress enacting the intervening rights provisions of section 252, courts understood that not having a change in claim language was not indispensible to creating intervening rights, and that a change in the specification could also lead to intervening rights. Contrary to the majority’s assertion, I do not claim that these cases directly control this case. They do, however, make clear that the Supreme Court, in developing the doctrine of intervening rights, concluded that the scope of the claims could change without formal amendments and still require the recognition of intervening rights. There is no indication in the legislative history of section 252 that Congress intended to overrule the courts’ understanding on this *1376 point. See H.R.Rep. No. 82-1923. As noted, section 307, added in 1980, was explicitly designed to provide “similar” intervening rights as those provided in section 252. Id. If a change in the language of the specification could result in an “amended” claim, it is difficult to see why a change in claim scope achieved by argument cannot also result in an amended claim.[8]
Most important, we must interpret “amended” to effectuate the intent of Congress in enacting the intervening rights provisions of the reexamination statutes. See Reves v. Ernst & Young, 494 U.S. 56, 62-63,110 S.Ct. 945, 108 L.Ed.2d 47 (1990) (“Thus, the phrase ‘any note’ should not be interpreted to mean literally ‘any note,’ but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts.”). If “amended” only refers to changes in the actual language of the claims, the purpose of intervening rights will be plainly and directly thwarted.
It is initially important to understand that the majority agrees that claim scope can be changed by arguments made by the patentee during reexamination.[9] In other words, the fundamental assumption of the majority is that even where argument in the reexamination proceeding changes the scope of the claim, there are no intervening rights unless there is a formal amendment to the claim. What the majority does not tell us — in large part because it chooses to address this issue in dictum without applying the rule to this case — is whether, when there is a change in claim scope without formal amendment, (1) the changed claim scope is retroactive to validate the patent as of its original issue date, or (2) the accused infringer can still challenge the validity of the patent during the pre-examination period.
Neither of these alternatives makes sense, and each directly contradicts the purpose of the statute, thus demonstrating *1377 the error in the majority’s statutory interpretation. The first alternative — retroactively validating the original patent by changing its scope — leads to an unfair and absurd result. As recognized by the majority, this is precisely the unfairness that led to the development of the doctrine of intervening rights in the first place. See Maj. Op. at 1361 (“The doctrine of intervening rights first developed as courts recognized that permitting substantive changes to the scope of patent claims through post-issuance procedures left ‘the door ... open for gross injustice ’ where a third party, having already begun to make, use, or sell a given article, finds its previously lawful activities rendered newly infringing under a modified patent.” (quoting Sontag Chain Stores Co. v. Nat’l Nut Co., 310 U.S. 281, 293-95, 60 S.Ct. 961, 84 L.Ed. 1204 (1940) (emphasis added))). The intervening rights provisions make clear that the reexamined and changed claims are valid only for the future after reexamination. As noted in Bloom, Engineering Co. v. North American Manufacturing Co.,
Sections 307 and 252 shield those who deem an adversely held patent to be invalid; if the patentee later cures the infirmity by reissue or reexamination, the making of substantive changes in the claims is treated as an irrebuttable presumption that the original claims were materially flawed. Thus the statute relieves those who may have infringed the original claims from liability during the period before the claims are validated.
129 F.3d 1247, 1249 (Fed.Cir.1997) (emphasis added). The second alternative— creating a judicial version of intervening rights — is even more directly contrary to the statute. Congress having considered the doctrine of intervening rights cannot have intended that the judiciary would develop a poor man’s version of the doctrine to account for the statute’s inadequate coverage. This strongly suggests that the statute should cover amendments by disclaimer.
Tellingly, the amici who support the court’s interpretation of the statute recognize that formal amendments to claim language during the course of reexamination are unusual. See Amicus Br. of Soverain et al. at 10. Telling too they admit that formal amendments are now, and will be, avoided for the very purpose of avoiding the creation of intervening rights. Id. at 4 (arguing that patent owners often “follow a course of not seeking to amend their asserted claims, with the settled understanding that if they could avoid claim amendments, they could also avoid intervening rights”). In other words, applicants will amend claims by argument rather than formal methods for the very purpose of avoiding intervening rights.
This very problem has led numerous amici to oppose the majority’s mechanical construction of the term “amend” and to recognize that the majority’s interpretation of intervening rights will create the very opportunities for mischief and “foster gamesmanship” that the statute was designed to avoid. Amicus Br. of Geico et al. at 9-10 (“[U]nder such a rule, patentees will be reluctant to change the words of their claims during reexamination or reissue and, instead, badger examiners with arguments changing the meaning of the words in the claims.”); Amicus Br. of Hewlett-Packard Co. et al. at 11 (“Appellee’s reading of the statute to exclude claims narrowed through disclaimer would lead to absurd results and discourage formal claim amendments in favor of prosecution history maneuvering.”). The majority’s construction of the statute defeats the public notice function of the patent system *1378 by encouraging patentees to define the scope of the invention outside of the claims themselves, thus not apprising accused infringers of what is available to them.
Allowing patent owners to avoid creating intervening rights by amending claims by argument is an abuse of the reexamination process and undermines the purpose of intervening rights. Section 307(b) cannot be construed to sanction such abuses.
To be sure, not every argument during reexamination should give rise to intervening rights, but intervening rights should be available where an argument during reexamination rises to the level of a clear and unambiguous disclaimer or disavowal of the original, correct claim construction. Here, Marine Polymer clearly and unambiguously disclaimed the scope of its claim by effectively becoming its own lexicographer and presenting a specific, limiting definition of the term “biocompatible.”[10] I respectfully dissent.

. See Key Pharms. v. Hercon Labs. Corp., 161 F.3d 709, 715 (Fed.Cir.1998) (Ordinarily, doctrines of estoppel, waiver, invited error, or the like would prohibit a party from asserting as 'error' a position that it had advocated at the trial.”).

. I also note that the p-GlcNAc tested in this example was produced through the "Mechanical Force” method described in the specification. '245 Pat. col.42 ll.15-17. The specification, however, also discloses other methods for producing p-GlcNAc with different "characteristics and advantageous features.” See id. col. 13 ll.46-67. There is no indication in the specification that p-GlcNAc produced pursuant to a different method would similarly not exhibit any biological reactivity.

. The claim construction is, of course, not precedential. See, e.g., Neil v. Biggers, 409 U.S. 188, 192, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

. See Hawkes v. Internal Revenue Serv., 467 F.2d 787, 793 (6th Cir.1972) (“This Court is obligated to take notice of changes in fact or law occurring during the pendency of a case on appeal which would make a lower court's decision, though perhaps correct at the time of its entry, operate to deny litigants substantial justice.”); see also L.E.A. Dynatech Inc. v. Allina, 49 F.3d 1527, 1531 (Fed.Cir.1995) (explaining that an “appellate court will consider an issue not presented below” if it, inter alia, “involves a pure question of law and refusal to consider it would result” in an injustice or “the appellant had no opportunity to raise the objection at the district court level”); Borlem S.A.-Empreedimentos Industriais v. United States, 913 F.2d 933, 939 (Fed.Cir.1990) ("[A] reviewing court is not precluded ... from considering events which have occurred between the date of an agency (or trial court) decision and the date of decision on appeal.”).

. Ohio ex rel. Eaton v. Price, 364 U.S. 263, 264, 80 S.Ct. 1463, 4 L.Ed.2d 1708 (1960) (explaining that where a judgment is affirmed by an equally divided court, "the usual practice is not to express any opinion, for such an expression is unnecessary where nothing is settled”); see also Etting v. Bank of United States, 24 U.S. 59, 77-78, 11 Wheat. 59, 6 L.Ed. 419 (1826); The Antelope, 23 U.S. 66, 126, 10 Wheat. 66, 6 L.Ed. 268 (1825).

. 35 U.S.C. § 252 provides, in relevant part:
The surrender of the original patent shall take effect upon the issue of the reissued patent, and every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form, but in so far as the claims of the original and reissued patents are substantially identical, such surrender shall not affect any action then pending nor abate any cause of action then existing, and the reissued patent, to the extent that its claims are substantially identical with the original patent, shall constitute a continuation thereof and have effect continuously from the date of the original patent.
A reissued patent shall not abridge or affect the right of any person or that person’s successors in business who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent.

. "Amend” is defined as "to change or alter in any way esp. in phraseology.” Webster's Third New International Dictionary 57 (2000).

. The majority is correct that section 307 contemplates that an amended claim will be identified as such in the reexamination certificate, but the failure of the PTO to identify an amended claim as such can hardly bind absent parties who had no opportunity to object to the PTO’s failure, especially given the "great principle of public policy ... which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided.” Brock v. Pierce Cnty., 476 U.S. 253, 261, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) (quoting United States v. Nashville, C. & St. L.R. Co., 118 U.S. 120, 125, 6 S.Ct. 1006, 30 L.Ed. 81 (1886)). It is well established that an administrative agency’s failure to perform a prescribed administrative act is not a ground for ignoring the substance of the agency’s action. See United States v. James Daniel Good Real Prop., 510 U.S. 43, 63, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) ("We have long recognized that many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them ... do not limit their power or render its exercise in disregard of the requisitions ineffectual.” (internal quotation marks omitted)); Brock, 476 U.S. at 261, 106 S.Ct. 1834; Timken U.S. Corp. v. United States, 421 F.3d 1350, 1357 (Fed.Cir. 2005).

. See Maj. Op. at 1363 ("Whether or not Marine Polymer’s arguments to the examiner and cancellation of claims during reexamination may have affected the remaining claims' effective scope, they did not ‘amend’ those claims for intervening rights purposes.... HemCon sidesteps this issue by emphasizing the well-recognized principle that arguments made during prosecution can affect the ultimate meaning of a claim term — and thus the 'scope' of a claim.... While it is true that claims are properly interpreted to account for arguments and concessions made during prosecution, HemCon's conclusion that the claims asserted here were ‘amended’ for purposes of § 307(b) goes too far.” (emphasis added)); see also Am. Piledriving Equip., 637 F.3d at 1336; CIAS, 504 F.3d at 1362; C.R. Bard, 388 F.3d at 867-69; Cole, 102 F.3d at 532.

. While absolute intervening rights should exist here as a matter of law, the issue of equitable intervening rights is a fact intensive one, involving numerous issues to be considered by the district court. Because the district court has not made any factual findings with respect to equitable intervening rights, this issue should be remanded to the district court for its consideration in the first instance, as the original panel ordered.